## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| CAMERON R. EXTINE, | CASE NO. 3:21-cv-02278 |
| Plaintiff, | DISTRICT JUDGE JAMES G. CARR |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Cameron R. Extine ("Plaintiff" or "Ms. Extine")[1] seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for Child Disability Benefits ("CIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the case has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I.  Procedural History

On December 29, 2018, Ms. Extine filed applications for SSI and CIB, alleging a disability onset date of April 30, 2016.  (Tr. 14, 166-71, 179-85.)  Ms. Extine asserted she was disabled due to anxiety, depression, paranoia, bilpolar II disorder, and social anxiety.  (Tr. 94, 109, 209.)  Her applications were denied at the initial level (Tr. 90-99) and upon reconsideration

---

[1] As reflected in the parties' briefing, it is Plaintiff's preference to be referred to using feminine pronouns.

(Tr. 105-113).  She then requested a hearing.  (Tr. 114.)  On October 28, 2020, Ms. Extine appeared for a hearing before an Administrative Law Judge.  (Tr. 36-57.)

On November 18, 2020, the ALJ issued an unfavorable decision, finding Ms. Extine had not been under a disability from May 4, 2016 through the date of the decision.  (Tr. 11-35.)  Ms. Extine requested review of the decision by the Appeals Council. (Tr. 163-65.)  On September 30, 2021, the Appeals Council denied Ms. Extine's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)

## II. Evidence

Ms. Extine's sole challenge in this appeal relates to the ALJ's decision not to include the state agency psychological consultants' limitation to superficial interaction in her residual functional capacity.  (ECF Doc. 7 pp. 2, 8-13, ECF Doc. 11).  The evidence summarized herein is accordingly focused on evidence pertaining to Ms. Extine's social interaction limitations.

### A.      Personal, Educational, and Vocational Evidence

Ms. Extine was born in 1998.  (Tr. 17.)  She graduated from high school.  (Tr. 40.)  She lived with her father, brother, and a friend.  (Tr. 39.)  She worked briefly as a stock associate and at a pizza restaurant.  (Tr. 17, 41-42.)

### B.      Medical Evidence

#### 1.      Treatment History

Ms. Extine generally received medical treatment at Mercy Health ("Mercy Health").  On October 17, 2016, she presented to Mercy Health to establish with a new primary care physician, Lisa Carey, D.O.  (Tr. 362.)  She reported some social anxiety.  (*Id*.)  She stated that she had her temporary driver's license, but it was overwhelming her and she feared road rage from others. (*Id*.)  She reported feeling more depressed during the winter.  (*Id*.)  She did not feel sad.  (*Id*.)

2

She said it just seemed as if nothing was fun.  (*Id*.)  She reported that she had not been showering and she was staying up later and later, playing video games with friends online. (*Id*.)  She reported trying Prozac and Xanax, but stopped taking Prozac when her anxiety was better.  (*Id*.)  She had then started taking Prozac again a month earlier, but did not take Xanax while she was practicing driving.  (*Id*.)  She reported seeing Dr. Strahan for counseling in the past, and said it helped a lot.  (*Id*.)  She had noticed she had not been very active, but did walk around the block with her dad every morning and went to the shooting range every few weeks.  (*Id*.)  Psychiatric examination findings included normal mood, affect, behavior, judgment, and thought content. (Tr. 364.)  Ms. Extine was diagnosed with panic disorder without agoraphobia.  (Tr. 365.)  Dr. Casey recommended that she continue to take Prozac and added Buspar.  (*Id*.)

Ms. Extine returned to Dr. Casey on January 31, 2017.  (Tr. 354.)  She reported having anxiety three times per week, but said it was not so bad that it prevented her from doing things. (Tr. 354-55.)  She also reported some depression and sleep problems.  (Tr. 355.)  She was planning on getting her driver's license in a few weeks.  (Tr. 354.)  She was excited about it but also nervous.  (Tr. 354-55.)  She reported that she was applying to college, with a plan to live on campus.  (*Id*.)  On examination, Ms. Extine's mood, affect, behavior, judgment, and thought content were normal.  (Tr. 356.)  She was diagnosed with anxiety.  (Tr. 357.)  Her Prozac dosage was increased, and she was advised to take Buspar as needed.  (*Id*.)

On February 28, 2017, Ms. Extine returned to Mercy Health where she saw Jami Blackburn, APRN-CNP to discuss her medications.  (Tr. 349-50.)  She felt that the increase in Prozac was really helping her anxiety and depression, but she reported undesirable side-effects since the increase.  (Tr. 350.)  She reported that Buspar was also helping.  (*Id*.)  Her mood, affect, behavior, judgment, thought content, cognition, and memory were normal on

examination.  (Tr. 352-53.)  She was diagnosed with anxiety and panic disorder without agoraphobia.  (Tr. 353.)  Prozac was decreased and Buspar was increased.  (*Id*.)

On March 28, 2017, Ms. Extine returned to CNP Blackburn to discuss her medications.  (Tr. 346.)  She reported that her side-effects had improved following the adjustment to her medications in February.  (*Id*.)  She also reported seeing another physician a few days earlier, Dr. Rhee, who added Wellbutrin XL and Concerta.  (*Id*.)  Psychiatric examination findings were normal.  (Tr. 348.)  She was diagnosed with anxiety, recurrent major depressive disorder (in partial remission), and panic disorder without agoraphobia.  (Tr. 349.)  Her medications were continued.  (*Id*.)

Ms. Extine returned to Dr. Casey on May 1, 2017, reporting that she did not feel that Prozac was working enough.  (Tr. 443, 449.)  She reported she was not getting out of the house often and most of her friends were online.  (Tr. 450.)  She was thinking about getting a job but said she had some social anxiety.  (*Id*.)  She felt she might be able to work at a gun shop in the summer.  (*Id*.)  Psychiatric examination findings were normal.  (Tr. 453.)  She was diagnosed with social anxiety disorder and anxiety.  (*Id*.)  Dr. Casey made no medication changes.  (*Id*.)

On June 14, 2017, Ms. Extine returned to CNP Blackburn for follow up regarding an earlier bronchitis diagnosis.  (Tr. 330-34.)  During the appointment, she stated she was struggling with gender identification.  (Tr. 330, 331.)  She explained that she felt more comfortable when her face was clean shaven, and it was more natural to her to be called "she."  (*Id*.)  She felt her parents would be supportive of her preferences.  (*Id*.)  Psychiatric examination findings were normal.  (Tr. 332.)  She was diagnosed with gender identity disorder, anxiety, recurrent major depressive disorder (in partial remission), and panic disorder without agoraphobia.  (Tr. 332-33.)  She was referred to a psychologist for her gender identity disorder diagnosis.  (Tr. 333.)

Ms. Extine returned to Dr. Casey on August 1, 2017 for follow up regarding her anxiety and depression.  (Tr. 530.)  She reported that a lower dose of Prozac was not helping much, and said she planned to talk again with her psychiatrist in September.  (*Id.*)  Psychiatric examination findings were normal.  (Tr. 533.)  Dr. Casey refilled her Prozac and Buspar until she could see her psychiatrist again.  (Tr. 534.)

On November 1, 2017, Ms. Extine returned to CNP Blackburn.  (Tr. 554.)  She was requesting a referral to a new psychiatrist because Dr. Rhee had informed her that he was closing his practice.  (*Id.*)  Psychiatric examination findings were normal.  (Tr. 557.)  She was diagnosed with social anxiety disorder and panic disorder without agoraphobia.  (Tr. 558.)

On March 8, 2018, Ms. Extine saw psychologist Esther Strahan, Ph.D. at Mercy Health regarding her anxiety.  (Tr. 316.)  Dr. Strahan noted that Ms. Extine was familiar to her because she had treated her in the past.  (*Id.*)  Ms. Extine reported that she was bothered because she had not made as much progress regarding her social anxiety as she had hoped.  (*Id.*)  She reported that she had recently sold guns so she could afford to take a trip to Canada to visit a friend.  (*Id.*)  She also reported she was in the process of being treated for gender dysphoria, stating that she felt "a mixture of hopefulness, anxiety, and relief about [the] decision to transition."  (*Id.*)   On mental status evaluation, Ms. Extine was alert and oriented with appropriate and normal thought content and normal thought process, cognition, memory, attention span, and activity.  (Tr. 318.)  Her mood was anxious and dysthymic.  (*Id.*)  Her affect was inappropriate and increased in intensity.  (*Id.*)  Her speech was pressured, and her insight and judgment were fair.  (*Id.*)  She denied suicidal and homicidal ideation.  (*Id.*)   She was diagnosed with social anxiety disorder and gender dysphoria.  (*Id.*)

Ms. Extine returned to Dr. Strahan on March 21, 2018.  (Tr. 711-14.)  She reported anxiety over her step-grandmother coming to visit because she was concerned her step-grandmother would make her drive and she was terrified to do so.  (Tr. 712.)  She explained that her social anxiety was preventing her from pursuing goals, including attending college to study forensics, but that she was looking into taking some online classes.  (*Id*.)  She also reported a history of cutting, saying that she did it sometimes to punish herself.  (*Id*.)  She acknowledged that doing so was "a terrible way of coping."  (*Id*.)   Mental status evaluation findings were similar to those from her prior visit and her diagnoses were unchanged.  (*Compare* Tr. 712-13 *with* Tr. 318.)

Ms. Extine returned to Dr. Strahan on April 20, 2018.  (Tr. 312.)  She reported some financial and familial stressors.  (Tr. 312-13.)  She said she was "doing more to push back at social anxiety," and was "pushing [her]self to speak with strangers, including clerks in stores." (Tr. 312.)  She had gone to the pet store on multiple occasions and interacted with pet store staff. (Tr. 312-13.)   Mental status evaluation findings were similar to those from her prior visits and her diagnoses were unchanged.  (*Compare* Tr. 313 *with* Tr. 318, 712-13.)

Ms. Extine returned to Dr. Casey on May 8, 2018.  (Tr. 590-96.)  She reported that Dr. Rhee had told her to call Dr. Katz, but that she had been too nervous to do so.  (Tr. 591.) Psychiatric examination findings were normal.  (Tr. 594.)  She was diagnosed with dysthymia and social anxiety disorder.  (Tr. 594-95.)

On May 15, 2018, Ms. Extine saw Chinyere Ugwanyi, APRN-CNP at Mercy Health regarding her mental health conditions.  (Tr. 303-07.)  She reported a long history of depression and anxiety dating back to when she was thirteen years old.  (Tr. 303-04.)  She reported: gender dysphoria, negative thoughts in the past about killing herself, sadness, low energy, poor

motivation, hopelessness, helplessness, worthlessness, sleep problems, anxiety, problems being around others, mood swings, flight of ideas, poor focus, racing thoughts, talkativeness, and pressured speech. (Tr. 304.) On mental status evaluation, Ms. Extine was alert and oriented with: appropriate and normal thought content; normal thought process and activity; grossly intact cognition; intact memory; and age-appropriate attention span and concentration. (Tr. 306.) Her insight and judgment were good. (*Id.*) Her speech was normal volume but pressured. (*Id.*) Her affect was flat with a decreased mood range. (*Id.*) She denied suicidal and homicidal ideation. (*Id.*) She was diagnosed with: bipolar II disorder, major depressive episode; panic disorder with agoraphobia; attention deficit disorder without hyperactivity; and gender dysphoria. (*Id.*) CNP Ugwanyi prescribed Lautuda and Vistaril, in addition to Prozac, and recommended that she continue with therapy. (*Id.*)

On June 18, 2018, Ms. Extine returned to Dr. Strahan. (Tr. 301.) She reported increased anxiety about the health of a snake she had given her mother as a birthday gift, but said she was feeling much better about it because the problem was resolved. (Tr. 301, 313.) She reported that her parents were talking about getting back together, which she felt was important because they were stressed financially. (Tr. 301.) She also reported making progress with her anxiety and depression, noting that she: was receiving treatment for gender dysphoria; had better grooming, including showering and changing clothes every day; was talking to strangers and going out more, including to public places; and had better nutrition habits. (*Id.*) On mental status examination, Ms. Extine's mood was anxious and her affect was "[b]land to mildly positive. Anxious." (Tr. 302.) Her speech was pressured and her insight and judgment were fair. (*Id.*) She denied suicidal and homicidal ideation. (*Id.*) Her thought process, thought content, cognition, memory, and attention span were normal. (*Id.*) She was diagnosed with social

anxiety disorder, gender dysphoria, bipolar II disorder, major depressive disorder, and panic disorder with agoraphobia.  (*Id*.)

On July 10, 2018, Ms. Extine saw CNP Ugwanyi for follow up and medication management.  (Tr. 292.)  She reported moderate mood improvement and diminished anxiety that was not crippling her anymore.  (*Id*.)  She also reported that her mood was better.  (*Id*.)  She was going out more, looking for a job, and making plans for herself.  (*Id*.)  She was still contemplating hormone therapy for gender transformation.  (*Id*.)  On examination, her grooming was fair and she was cooperative and attentive with good eye contact.  (Tr. 293.)  Her mood was "a lot better" and her affect was mood congruent.  (*Id*.)  Her speech was spontaneous with a normal rate and volume, her cognition was intact, and her memory was age appropriate.  (*Id*.)  Her thought process was linear, goal directed, and coherent.  (*Id*.)  Her insight and judgment were fair.  (*Id*.)  She was diagnosed with panic disorder with agoraphobia, attention deficit disorder, gender dysphoria, and bipolar disorder II, major depressive disorder.  (*Id*.)  Trazadone was added for sleep.  (*Id*.)

On August 21, 2018, Ms. Extine returned to Dr. Strahan.  (Tr. 289.)  She reported still having a lot of anxiety, but said she was pushing herself more.  (*Id*.)  One of her friends had moved in with their family.  (*Id*.)  She reported being a lot happier and talking to people more.  (*Id*.)  She was eating healthier food and doing some walking.  (*Id*.)  She lost five pounds in two months.  (*Id*.)  She had decided not to drive because they did not have a safe vehicle.  (*Id*.)  She reported that she was thinking about trying to get a part-time job, possibly as a janitor at a fitness center or at a pet store.  (*Id*.)  Mental status examination findings were generally normal, although her speech was pressured, her mood was anxious, and her affect was "[b]land to mildly positive" and anxious.  (Tr. 290.)  Her insight and judgment were fair.  (*Id*.)  She denied suicidal

and homicidal ideation.  (*Id*.)  She was diagnosed with panic disorder with agoraphobia, attention deficit disorder, gender dysphoria, social anxiety disorder, and bipolar disorder II, major depressive disorder.  (Tr. 291.)

Ms. Extine returned to Dr. Strahan on October 5, 2018.  (Tr. 284.)  She reported that she tried working at a pet store, but only lasted one day due to panic attacks.  (*Id*.)  She reported visual and some auditory hallucinations that she thought might be related to recent dextromethorphan abuse.  (*Id*.)  She reported that she wanted to stop the pattern of substance abuse, stating she was concerned it would prevent her from experiencing things she wanted to experience.  (Tr. 284-85.)  She was interested in going to a "Magyck" meeting, but was scared to go.  (Tr. 285.)  Her mental status examination findings and diagnoses were similar to past visits.  (*Compare* Tr. 285-86 *with* Tr. 290-91.)

Ms. Extine saw Dr. Strahan again on October 26, 2018.  (Tr. 281-82.)  She continued to report struggles with substance abuse and said the sounds in her head were worse.  (*Id*.)  She also reported that she had to face some fears after finding family members' dead pets and having to bury them.  (Tr. 282.)  She was very anxious that her pet rat would die.  (*Id*.)  She asked Dr. Strahan if she would support a claim for disability.  (*Id*.)  Dr. Strahan "suggested it would not be the best, clinically."  (*Id*.)  Her mental status examination findings and diagnoses were similar to past visits.  (*Compare* Tr. 282-83 *with* Tr. 285-86, 290-91.)

On November 19, 2018, Ms. Extine returned to Dr. Strahan.  (Tr. 278-79.)  She reported doing "mostly OK."  (Tr. 279.)  Her mom had been in the hospital and she was grieving the loss of her pet rat.  (*Id*.)  She was planning on visiting a friend in Missouri and was excited about it.  (*Id*.)  She said she was not too anxious about dangerous things, but was afraid of normal developmental behaviors, like driving and going to college.  (*Id*.)  She reported doing a "full

detox" from alcohol and dextromethorphan.  (*Id.*)  Dr. Strahan noted again that supporting a disability claim "would not be the best, clinically."  (*Id.*)  Her mental status examination findings and diagnoses were similar to past visits.  (*Compare* Tr. 280 *with* Tr. 282-83, 285-86, 290-91.)

On January 7, 2019, Ms. Extine returned to Dr. Strahan, reporting she was doing "mostly OK."  (Tr. 276.)  She still had "a sense of 'someone' wanting [her] to do things," but said she had not been hearing voices since cutting down on the substance abuse.  (*Id.*)  She reported less self-cutting in recent years, but also reported a sense of wanting to hurt herself by cutting off the tip of her pinky, with no actual intent.  (*Id.*)  She was happy about getting a new pet rat.  (*Id.*) She reported that her depression had been worse, and that she continued to have anxiety about going places.  (*Id.*)  However, she had been making herself go to the store and was interested in trying to get a job again.  (Tr. 276-77.)  She reported she was continuously missing doses of her medication, but was working on a plan to stay more consistent with it.  (Tr. 277.)  She described a new hobby of making model figures.  (*Id.*)  Her mental status examination findings and diagnoses were similar to past visits.  (*Compare* Tr. 277-78 *with* Tr. 280, 282-83, 285-86, 290-91.)

On January 22, 2019, Ms. Extine returned to CNP Ugwanyi after seven months for follow up and medication management.  (Tr. 425.)  She reported some improvement in her mood, but also reported that there were days that she was unmotivated and barely able to get out of bed.  (*Id.*)  She said she had a hard time falling asleep, but was not willing to take Trazadone as ordered because her therapist had told her that it would do more harm than good.  (*Id.*)  She was going to a card shop once a week to get used to being around people.  (*Id.*)  She denied current thoughts of hurting herself, but said they occur sometimes.  (*Id.*)  She was still considering hormone therapy for gender transformation, but had been told she had to lose weight

before treatment could commence.  (*Id*.)  She denied medication side effects.  (*Id*.)  She said she was not taking Latuda because she did not know it had been ordered.  (*Id*.)  CNP Ugwanyi advised her she should be taking Latuda along with Prozac, Buspar, and Vistaril.  (*Id*.)  Mental status examination findings were generally normal, including normal mood and affect.  (Tr. 426.)  She was diagnosed with panic disorder with agoraphobia, attention deficit disorder without hyperactivity, gender dysphoria, and bipolar disorder II, major depressive episode.  (*Id*.)

On February 4, 2019, Ms. Extine returned to Dr. Strahan, reporting that she was "doing all right," but was still having episodes of intense anxiety and had thoughts that she felt were psychotic.  (Tr. 422-23.)  She explained that her heart, chest, arms, and neck hurt during periods of intense anxiety.  (Tr. 423.)  She said the psychotic thoughts lasted about five seconds and occurred once or twice a week, every other week, and mostly at night.  (Tr. 423.)  She stated she could usually reason with herself when this occurred and the thoughts would subside.  (*Id*.)  She reported she had not been using substances and wanted to get out and see the world.  (Tr. 422.)  She had started high intensity interval training and was motivated to lose weight so she could proceed with hormone treatments.  (Tr. 422-23.)  Her mental status examination findings and diagnoses were similar to past visits with Dr. Strahan.  (*Compare* Tr. 423-24 *with* Tr. 277-78, 280, 282-83, 285-86, 290-91.)

Ms. Extine saw Dr. Strahan again on March 11, 2019.  (Tr. 437.)  She reported "doing all right," but also reported a very intense intake of alcohol, several episodes of depression, and a panic attack that she described as "the worst panic attack ever."  (Tr. 437-38.)  She reported she had been erratic about her medications and Latuda was not affordable.  (Tr. 438.)  On mental status examination, her speech was pressured, her mood was depressed, and her affect was described as "[b]land to mildly positive.  Anxious.  Laughing appropriately at times."  (*Id*.)  Her

examination findings were otherwise unremarkable.  (Tr. 438-39.)  She was diagnosed with gender dysphoria, social anxiety disorder, and bipolar II disorder, major depressive episode.  (Tr. 439.)

A couple of weeks later, on March 26, 2019, Ms. Extine returned to Dr. Strahan, reporting a lot of anxiety and saying even short interactions with strangers caused heightened arousal.  (Tr. 751-52.)  They discussed possibly using propranolol for some "exposure-based exercises" Dr. Strahan was encouraging.  (Tr. 752.)  She continued to report struggles with substance abuse and a desire to stop using.  (*Id*.)  She reported some "visual quirks" that did not rise to the level of hallucinations.  (*Id*.)  She said she wanted to be independent in her activities of daily living and did not think she should be living off her parents at age twenty.  (*Id*.)  She wanted to move out and live with a friend if she was awarded disability benefits.  (*Id*.)  Mental status examination findings were similar to findings from her last session.  (*Compare* Tr. 753 *with* Tr. 438-39.)  She was diagnosed with gender dysphoria, social anxiety disorder, and bipolar II disorder, major depressive episode as well as attention deficit disorder without hyperactivity, panic disorder with agoraphobia, and polysubstance abuse.  (Tr. 753.)

On April 23, 2019, Ms. Extine saw Dr. Strahan.  (Tr. 759.)  She was pleased with staying away from substances.  (*Id*.)  She had been talking with a friend who lived in the UK and was planning to see a movie with her roommate.  (*Id*.)  She reported some thoughts of self-harm but did not want to harm herself.  (*Id*.)  She expressed some paranoia about her online friendships and how to build those friendships and trust them.  (*Id*.)  She reported showering every two to three days.  (*Id*.)  She was playing some games that were positive and outside her comfort zone.  (Tr. 760.)  She reported two or three recent panic attacks, indicating that one of them was due to excessive coffee intake.  (*Id*.)  She wanted to buy "girl clothes" and start transitioning.  (*Id*.)  Mental

status examination findings were unchanged.  (Tr. 760-61.)  Her diagnoses were similar to past diagnoses. (*Compare* Tr. 761 *with* Tr. 753.)

Ms. Extine saw Dr. Strahan on June 10, 2019, reporting familial stressors, auditory hallucinations when things were quiet, occasional obsessive-compulsive symptoms, and some experiences of depersonalization.  (Tr. 763.)  She said she was only showering once or twice a week, but recognized her self-care was not good and indicated that she wanted to shower more often.  (*Id*.)  She reported handling the death of her pet rat well.  (*Id*.)  She was pleased with herself for going to see the new Avengers movie with her roommate on the day it was released.  (*Id*.)  She reported challenging her anxiety by going to a store with her roommate and having someone over that she met through a dating app.  (*Id*.)  Mental status examination findings were unchanged.  (Tr. 764.)  Her diagnoses were similar to past diagnoses. (*Compare* Tr. 764 *with* Tr. 753, 761.)

The following week, on June 17, 2019, Ms. Extine met with Tamara Lipshie, M.D. at Mercy Health in the psychiatry department for treatment of her anxiety and depression.  (Tr. 704.)  Dr. Lipshie noted that Ms. Extine was previously followed in the practice by CNP Ugwanyi.  (*Id*.)  Ms. Extine complained of generalized anxiety, daily panic attacks, difficulty leaving the house due to anxiety, hypersomnia, anhedonia, self-deprecating rumination, and dissociative episodes.  (*Id*.)  She also reported auditory hallucinations and occasional visual hallucinations.  (*Id*.)  She stated that she spent most of her time at home playing online video games.  (Tr. 705.)  On mental status evaluation, she was cooperative with appropriate behavior, good eye contact, and normal speech.  (*Id*.)  She was depressed and reported hallucinations, but had a full, appropriate, and mood congruent affect with goal directed and coherent thought process and appropriate thought content.  (*Id*.)  Her judgment appeared normal and appropriate, and she had good insight into her illness.  (*Id*.)  She was diagnosed with panic disorder with

agoraphobia, depressive disorder, episodes of formed visual hallucinations, and auditory hallucinations.  (*Id*.)  Dr. Lipshie did not feel that Ms. Extine's presentation or history supported a diagnosis of bipolar II disorder.  (*Id*.)  Latuda was discontinued because of the risk of increased weight and metabolic syndrome outweighed the possible benefits and Prozac was increased. (*Id*.)

On September 11, 2019, Ms. Extine returned to Dr. Lipshie.  (Tr. 769.)  She reported that her mood was low, with no change following the increase in Prozac.  (*Id*.)  She reported that she had missed scheduled appointments, including one with Dr. Strahan, and had not called to reschedule.  (*Id*.)  She complained of generalized anxiety as well as difficulty leaving her house. (*Id*.)  She denied hallucinations and said she did "experience her thoughts as somehow separate from herself."  (*Id*.)  Examination findings were generally normal, except that her mood was depressed, there were noted fantasies of self-harm with no urge to act, and there were also visual and auditory illusions with dissociative episodes.  (Tr. 770.)  She was diagnosed with panic disorder with agoraphobia, moderate episode of recurrent major depressive disorder, and dissociation.  (*Id*.)  Dr. Lipshie adjusted Ms. Extine's medications, cross tapering fluoxetine (Prozac) to duloxetine (Cymbalta).  (*Id*.)

Ms. Extine followed up with Dr. Lipshie on October 23, 2019.  (Tr. 772.)  She reported that her dissociative/hallucinatory experiences had resolved.  (*Id*.)  Her mood was still low, but she had periods when she was able to enjoy herself.  (*Id*.)  She reported continued problems with self-care.  (*Id*.)  She did not feel that her anxiety had significantly subsided, but she reported that she was able to go to the store and planned to go out the next day with her roommate to apply for food stamps.  (*Id*.)  Her appearance on examination was described as unkempt and her mood was depressed.  (Tr. 773.)  The other examination findings were generally normal.  (*Id*.)  Her

diagnoses were unchanged.  (*Id*.)  Dr. Lipshie continued Cymbalta for another month, noting that Ms. Extine's symptoms appeared to be improving.  (*Id*.)

On January 8, 2020, Ms. Extine met with Katherine Kropf, D.O. at OhioHealth Physician Group Primary Care as a new patient for hormonal support transitioning.  (Tr. 785-89.)  She discussed her struggles with coming to understand herself and being transgender.  (Tr. 787.)  Psychiatric examination findings were normal, including good judgment, normal mood and affect, and no memory deficits.  (Tr. 788.)  Ms. Extine stated she was interested in hormonal transition for gender affirmation.  (*Id*.)

On January 20, 2020, Ms. Extine returned to Dr. Lipshie, reporting she had a consultation regarding hormone replacement therapy and was optimistic about starting therapy the following month.  (Tr. 775.)  She reported a dip in her mood a few weeks earlier, but her current mood was stable.  (*Id*.)  She reported problems sleeping.  (*Id*.) Her anxiety was more frequent in nature but less severe.  (*Id*.)  She enjoyed playing video games and was trying to engage in an anxiety provoking event, such as going to a store or talking to a cashier, every other day.  (*Id*.)  She reported some problems concentrating.  (*Id*.)  On examination her mood was okay and other findings were generally normal, including cooperative and appropriate behavior.  (Tr. 776.)  There were no changes to her diagnoses or medications.  (*Id*.)  Dr. Lipshie noted that Ms. Extine's mood was improved, and her anxiety was decreased.  (*Id*.)

On February 26, 2020, Ms. Extine returned to Dr. Kropf regarding hormone replacement therapy.  (Tr. 794-97.)  She was started on hormones that day.  (Tr. 797, 801.)

On March 4, 2020, Ms. Extine returned to Dr. Lipshine.  (Tr. 778.)  She reported being optimistic about starting hormone replacement therapy.  (*Id*.)  However, she reported she was still struggling with a lowered mood, sleep disturbances, and significant anxiety.  (*Id*.)  On

examination, her hygiene was observed to be poor.  (Tr. 779.)  Otherwise, examination findings were generally normal.  (*Id*.)  She was diagnosed with panic disorder with agoraphobia and moderate episode of recurrent major depressive disorder, with a notation that her mood was improved.  (*Id*.)  Dr. Lipshine made no medication changes since Ms. Extine had recently started hormone replacement therapy.  (*Id*.)  She encouraged Ms. Extine to get out of the house each day and directed her to follow up with Dr. Soder in two months.  (*Id*.)

On May 4, 2020, Ms. Extine attended a virtual visit with Angela Soder, M.D. in the Mercy Health psychiatry department.  (Tr. 851.)  She reported she was stable and compliant with her medications.  (*Id*.)  Her mental status examination was unremarkable.  (Tr. 852.)  She was diagnosed with panic disorder with agoraphobia, moderate episode of recurrent major depressive disorder, and gender dysphoria.  (Tr. 853.)  Dr. Soder increased Ms. Extine's Cymbalta due to reported benefit for her mood, dissociations, and anxiety.  (Tr. 851, 852.)

On August 31, 2020, Ms. Extine saw Dr. Soder again for a virtual visit.  (Tr. 843.)  She reported being "up and down" and she felt the summer was boring.  (*Id*.)  She reported being stable and compliant with her medication, but also reported missing a few doses of medication on occasion, stating that "those days [were] always terrible."  (Tr. 842-43.)   She also reported dissociating more but she was not sure why.  (*Id*.)  She reported less severe anxiety, but it was still present most of the time.  (*Id*.)   She said she thought Cymbalta helped her anxiety more than Prozac.  (*Id*.)  However, she reported she felt "emotionally flat."  (*Id*.)  She described her mood as "melancholy," stating she had fun sometimes, but she was "never necessarily happy."  (*Id*.) She denied hallucinations or suicidal intent or plan.  (*Id*.)  She stated she used Trazadone in the past for insomnia and a couple of nights each week for anxiety.  (*Id*.)  Her examination findings were generally normal, except that her mood was anxious and dysphoric.  (*Id*.)  Her diagnoses

were not changed.  (Tr. 844.)  Dr. Soder planned to wean Ms. Extine off Cymbalta due to emotional flattening and start her on Effexor for mood and anxiety.  (*Id*.)  Dr. Soder also prescribed Trazadone as needed.  (*Id*.)

### 2.    Opinion Evidence

#### a.    Treating Source

On October 26, 2020, Dr. Strahan completed a Medical Source Statement as to Ability to Perform Work Related Activities (Mental).  (Tr. 855-57.)  She opined that Ms. Extine had no or only mild limitations in social interaction.  (Tr. 855.)  She explained: "This patient is generally open, likeable, self-reflective, and good with feedback.  Social anxiety would cause some environments to be worse than others, but should abate some with time."  (*Id*.)  Dr. Strahan opined that Ms. Extine had no to moderate limitations in the areas of adaptation and sustained concentration and persistence.  (Tr. 855-56.)  She opined that with "appropriate support [and] gradual work hardening program," it was not likely that Ms. Extine would have partial or full day unscheduled absences from work occurring five or more days each month due to her conditions or medication side effects.  (Tr. 857.)  She also opined that Ms. Extine's condition would likely deteriorate if she was placed under the stress of an eight-hour per day, five-day per week job.  (*Id*.)  She explained: "If this were to happen all [at] once, I would foresee a decline in [function].  I think half time is a better goal, to see if that is feasible."  (*Id*.)

#### b.    State Agency Psychological Consultants

On initial review, on March 1, 2019, state agency psychological consultant Cindy Matyi, Ph.D. opined that Ms. Extine had the following mental limitations: mild limitations in her ability to understand, remember, or apply information; moderate limitations in her ability to interact with others; moderate limitations in her ability to concentrate, persist, or maintain pace; and

moderate limitations in her ability to adapt or manage oneself.  (Tr. 60, 67.)  Dr. Matyi also opined that Ms. Extine had the mental RFC to:

- comprehend and remember a variety of task instructions;

- carry out simple tasks in a work environment with no demand for fast pace or strict production quotas;

- sustain in a work environment with no more than occasional superficial interaction with others; and

- sustain in a work environment with no more than routine changes which are explained in advance.

(Tr. 62-63, 69-70.)  At the reconsideration level, on March 27, 2019, state agency psychological consultant Courtney Zeune, Psy.D. affirmed the mental limitations and mental RFC from the initial level.  (Tr. 77, 80-81, 84, 86-88.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the October 28, 2020, hearing, Ms. Extine testified in response to questioning by the ALJ and her counsel.  (Tr. 39-50.)  She stated she did not have her driver's license because her anxiety caused her to get foggy and make decisions on the road that made it dangerous for her to drive.  (Tr. 40.)  She also stated that Dr. Strahan recommended that she put off learning how to drive.  (*Id*.)  When asked what prevented her from being able to work full time, she stated:

> So, my problems, I mean, I have agoraphobia.  I can barely leave the house in general.  But even if I could, which I can't, my anxiety is just too much.  It is too much.  I start getting -- I freeze up, I have trouble functioning I guess would be the word.  Some of the other problems, if I may, are, like, I mean, for one, I can't be outside and stuff alone with people that I don't, like, know personally and stuff.

> By outside I just mean anywhere outside of my home.  I need someone there.  And for one, learning new things has always been difficult for me with my anxiety.  I have trouble talking to people, as I'm sure you can tell right now, and I just have -- I start locking up.  I'm sorry.

> I start locking up, I start losing, like, focus I guess would be the term.  I get, like, a brain fog.  I will start to dissociate when I get anxious and, I mean, almost everything makes me anxious.  Yeah, those are some of the issues I have with being able to work.

(Tr. 40-41.)  When asked to explain what happened when she was "dissociating," she stated she had a foggy brain and zoned out, and it was hard for her to focus.  (Tr. 47-48.)  She said she dissociated about three times week, which was brought on by anxiety and panic attacks.  (Tr. 41, 48-49.)  She stated that confrontation brought on her panic attacks, including confrontation that occurred during a television show or movie.  (Tr. 48-49.)

Ms. Extine also testified about her experience while working at the pizza restaurant, explaining she "was absolutely terrified" that she would have to work the front desk, cash register, or answer the telephone when she worked at the pizza restaurant.  (Tr. 41-42.)  She would pretend that a door shut on accident so she could avoid hearing the phone ring and having to answer it.  (Tr. 42.)  She stated she would go to the freezer if there was a lunch rush to calm herself and try to function.  (*Id*.)  She also stated that she was afraid she would get in trouble if she messed up at work.  (*Id*.)

Ms. Extine was able to take care of her own showering and cooking, and she could perform household chores most of the time.  (Tr. 45.)  Her hobbies included playing video games, reading, and watching movies with her roommate.  (Tr. 46-47.)  She described her typical mood as dull and flat, stating that she felt "empty a lot."  (Tr. 49.)  She stated also that her mood went down due to depression.  (*Id*.)  She explained that she tried to accept criticism or instruction when in front of people, bur internally she beat herself up about it.  (*Id*.)  She stated that she used to think she heard voices, but she later realized that it was her "depression manifesting in a unique way."  (Tr. 49-50.)  She stated that she had "[her] version of good days

and bad days," explaining: "I say my version because every day is, you know, every day is a bit of a struggle at least.  By a bit, I do mean, you know, it's a struggle."  (Tr. 50.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 50-56.)  The ALJ informed the VE that there was no past relevant work.  (Tr. 51.)  In response to a hypothetical question mirroring the ALJ's assessed RFC, the VE identified the following light, unskilled jobs as available in the national economy: routing clerk, marking clerk, and housekeeper.  (Tr. 51-52.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant may also be entitled to child's disability benefits if she is at least 18 years old and has a disability that began before she turned 22 years old. 42 U.S.C. § 402(d)(1)(B)(ii); 20 C.F.R. § 404.350(a)(5).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his November 18, 2020, decision, the ALJ explained that:

[T]he claimant alleged disability beginning April 30, 2016, when the claimant was not 18-years of age. However, the claimant is only eligible for disabled child's insurance benefits when [she] is 18 years old or older and has a disability that began before attaining age 22 (20 CFR 404.350(a)(5)). The claimant is also only eligible for supplemental security benefits since December 29, 2018, the date of the claimant's current application for supplemental security income. As a result, it is unnecessary to consider whether the claimant was disabled prior to age 18, and the period being adjudicated by this decision is from May 4, 2016, the date the claimant attained age 18 for Social Security purposes, through the date of this decision.

(Tr. 14.)  The ALJ then made more specific findings, which are summarized below:

1.      The claimant was born in 1998 and had not attained the age of 22 as of April 30, 2016, the alleged onset date.  (Tr. 17.)

2.      The claimant has not engaged in substantial gainful activity since May 4, 2016.  (*Id*.)

3.      The claimant has the following severe impairments: asthma and/or seasonal allergic rhinitis; obesity; anxiety and/or social anxiety and/or panic disorder and/or agoraphobia; attention deficit hyperactivity disorder (ADHD) and/or attention deficit disorder (ADD); major depressive disorder and/or bipolar disorder; gender dysphoria; and personality disorder.  (*Id*.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 17-19.)

5.      The claimant has the RFC to perform light work as defined in the regulations except: postural limitation of occasional climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; frequent stooping, kneeling, and crouching; occasional crawling; occasional use of the bilateral lower extremities for operation of foot controls; manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering; environmental limitation to avoid concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights; additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases; work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes; occasional interaction with the general public, coworkers, and supervisors.  (Tr. 19-28.)

6.      The claimant has no past relevant work. (Tr. 28.)

7.      The claimant was born in 1998 and was 18 years old, defined as a younger individual age 18-49, on May 4, 2016.  (*Id*.)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not an issue because claimant has no past relevant work.  (*Id*.)

10.     Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 28-29.)

Based on the foregoing, the ALJ determined that Ms. Extine had not been under a disability from May 4, 2016 through the date of the decision.  (Tr. 29.)

## V. Plaintiff's Argument

Ms. Extine presents one argument in this appeal.  (ECF Doc. 7 pp. 8-13, ECF Doc. 11.) She contends that "the ALJ failed to provide adequate reasoning explaining how the opinions from the State Agency psychologists [which the ALJ found to be generally persuasive] were included in the residual functional capacity" and therefore the decision is not supported by substantial evidence.  (ECF Doc. 7 p. 8.)  More specifically, Ms. Extine argues that the ALJ erred by not properly explaining why the state agency psychologists' opinion that she "would be limited to superficial interaction with others" was "not accounted for in the RFC."  (*Id.* at p. 9.)

## VI. Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if a preponderance of evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'")(quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004)).  A decision will also not

24

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: Whether ALJ Erred in Finding State Agency Psychological Consultant Opinions Generally Persuasive Without Including Limitation to "Superficial" Interactions**

As a general matter, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see also Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) ("[A]n ALJ is not required to use 'the exact language of [the medical] professionals' when incorporating limitations in the RFC.") (quoting *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436 (6th Cir. 2014)), *report and recommendation adopted*, No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019). Even where an opinion is given great weight, the Sixth Circuit has noted "there is no requirement that an ALJ adopt a state agency psychologist's opinion[] verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, No. 1:13-CV-00395, 2013 WL 6283681, at *7–8 (N.D. Ohio Dec. 4, 2013) (finding ALJ who gave great weight to an opinion was not required to incorporate all limitations from that opinion).

Ms. Extine recognizes this principle, (ECF Doc. 7 p. 12), but argues that reversal or remand is required because the Commissioner found the state agency psychological consultants' opinions "generally persuasive" but failed to adequately explain why the state agency psychological consultants' opinion that she should be limited to superficial interaction with others was not included in the RFC (ECF Doc. 7 p. 9).   She asserts that the ALJ's decision

"makes it impossible for a subsequent reviewer to truly understand why this specific opinion was omitted from the residual functional capacity." (ECF Doc. 11 p. 5.) The Commissioner responds that "[t]he ALJ reasonably found the State agency psychologists' findings to be persuasive while also explaining why he rejected . . . the State agency's limitation that Plaintiff could only tolerate superficial interactions." (ECF Doc. 10 p. 8.)

The psychological consultants opined that Ms. Extine had moderate limitations in her ability to interact with others and could "sustain in a work environment with no more than occasional superficial interaction with others." (Tr. 60, 63, 67, 77, 80, 84, 87.) In comparison, the RFC provided in relevant part that Ms. Extine was able to have "[o]ccasional interaction with the general public, coworkers, and supervisors." (Tr. 19.)

In analyzing the evidence of record and explaining how persuasive he found the medical opinion evidence, the ALJ stated the following regarding the persuasiveness of the state agency psychological consultants' opinions:

> The undersigned finds the State agency psychological consultants' opinions are generally persuasive. Primary care records consistently exhibited the claimant's behavior was normal (Exhibits 1F/41, 54-55, 58-59, 61-63, 72-73, 79, 83-84, 87-88, 93-95, 4F/12-13, 59-62, 92-94 and 5F/12-13, 49). Other examiners as well consistently noted the claimant was cooperative and/or pleasant during appointments (Exhibits 1F/23-24, 6F/22-23, 45, 8F/2-14 and 13F/7, 16). The claimant also provided she was able to go out in the community for daily walks, to shop and to visit friends along with she could interact with friends online (Exhibits 1F/10, 20-25, 32, 43-49, 70, 93, 2F/4-6, 8, 3F/4-6, 4F/8-9, 5F/96-97, 6F/34, 7F/1-9, 11-12, 14-18, 39-43, 50-57 and 9F/1-2). Consequently, the above appears to support that the claimant is capable of more than superficial interaction with others.
>
> Nevertheless, while therapy records reflected the claimant was able to confront the issue of social anxiety and generalized anxiety despite her gender dysphoria, therapy records noting she still struggled with anxiety bouts at times supports the State agency consultants' opinions that the claimant is limited to occasional interaction with others (Exhibits 1F/20, 25, 32, 43-44, 2F/4-6, 3F/4-6, 7F/1-4, 8-9, 11-12, 14-18, 39-43, 50-57 and 9F/1-2). The residual functional capacity considered such in finding the claimant is limited to occasional interaction with the general public, coworkers, and supervisors. The record also reveals the claimant

has required medication for ADHD and/or ADD at times and she had some episodes of depersonalization at times (Exhibits 1F/18-19, 77-80, 6F/44 and 7F/21).

While treatment records demonstrate medication was helpful in improving such symptoms, the above supports the State agency consultants' opinions as well that the claimant is limited to carrying out simple tasks in a work environment with no demand for fast pace or strict production quotas where there is no more than routine changes (Exhibits 1F/6-21, 26, 37, 44, 46, 49, 78, 2F/4-8, 3F/4-6, 6F/11, 34, 7F/1-4, 8-9, 11-12, 14-18, 39-46, 8F/7-14, 9F/1-2 and 13F/7, 16). The residual functional capacity accounted for such in finding the claimant is limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes.

(Tr. 24-25 (emphasis added).)

Contrary to Ms. Extine's position (ECF Doc. 7 p. 8), the ALJ did provide "traceable reasoning" linking the opinions of the state agency psychological consultants to the RFC which among other limitations limited Ms. Extine to "occasional interaction with the general public, coworkers, and supervisors" (Tr. 19) rather than "occasional superficial interaction with others" (Tr. 60, 63, 67, 77, 80, 84, 87).  The ALJ did so with specific references to record evidence to support his reasoning.  (Tr. 24-25.)

Ms. Extine acknowledges that the ALJ "specifically addressed" the psychologists' opinion that she "could engage in no more than superficial interaction with others" and that the ALJ "pointed to various pieces of evidence to come to the conclusion that [Plaintiff] was capable of more than superficial interaction with others."  (ECF Doc. 7 pp. 10-11.)  However, she contends that the examples provided by the ALJ "do not completely invalidate the State Agency psychologists' opinion that [she] should be limited to superficial interaction" (id. at p. 11) and contends that the ALJ's explanation is not adequate "because it does not allow a subsequent reviewer to understand how the ALJ was persuaded by other opinions provided by the State Agency psychologists but not the opinion concerning superficial interaction" (id. at p. 12).

The undersigned finds that the ALJ's explanation is more than sufficient and allows for meaningful review of the decision, and in particular allows for meaningful review of the ALJ's decision to limit Ms. Extine to "occasional" but not "superficial" interactions with others.

Ms. Extine's contention that the examples cited by the ALJ "do not completely invalidate the . . . opinion that [she] would be limited to superficial interaction" (ECF Doc. 7 p. 11) misses the mark.  As explained above and as acknowledged by Ms. Extine (ECF Doc. 7 p. 12), an ALJ is not required to incorporate verbatim into the RFC an opinion, even an opinion that is given great weight.  *Poe*, 342 F. App'x at 157; *Modro*, 2019 WL 1986522, at *7; *Reeves*, 618 F. App'x at 275; *Moore*, 2013 WL 6283681, at *7–8.

Moreover, the ALJ considered evidence that the Ms. Extine contends supports a more limiting social interaction limitation.  In support of her claim that the ALJ erred by concluding that the evidence did not support a limitation to both occasional <u>and superficial</u> interaction with others, Ms. Extine points to her own subjective reports and testimony regarding her symptoms, including her reports and testimony that she attended "online school because [she] was afraid of being around people," she "could barely get out of bed" at times, "had trouble leaving the house," her "anxiety was still pronounced when out of the house," her anxiety was "too much" and she would "freeze up" and "have trouble functioning," and her anxiety prevented her from learning new things..  (ECF Doc. 7 pp. 11-12.)   The ALJ considered Ms. Extine's subjective reports, including her testimony that:

> [S]he lives with [her] father, brother and roommate. [She] stated [she] has never had a driver's license due to [her] anxiety making it hard for [her] to make decisions on the road making it too dangerous to drive. [She] testified [she] [was] prevented from working as a result of agoraphobia, as [she] can barely leave the house in general, and [her] anxiety is too much. [She] stated [she] freezes up and has trouble functioning, as [she] cannot even be outside alone with people that [she] does not know personally and learning new things is difficult because of [her] anxiety. [She] further testified [she] has trouble talking to people, [she] loses focus easily and [she]

has problems with organizing in [her] brain along with dissociates when [she] gets anxious.

(Tr. 20.)

The ALJ also considered other evidence of record that documented Ms. Extine's reported struggles with anxiety. For example, the ALJ explained that:

> the record reflects the claimant has regularly reported of social anxiety that [she] reported made it hard to drive and participate in activities outside the home since establishing care with a primary care provider in mid-October 2016 (Exhibits 1F/4-6, 20, 23-25, 32, 35-38, 43-50, 70, 93, 2F/4-7, 3F/4-6, 4F/8-9, 6F/7-12, 21-24, 32, 44-45, 7F/1-11, 39-49 and 8F/1-7). Beginning in June 2017, the claimant as well related of having gender identity issues that attributed to [her] anxiety (Exhibits 1F/63-64, 4F/63 and 7F/1, 11). The claimant also indicated at times that [she] was depressed, particularly in the winter, leading to a lack of motivation, not showering regularly and overeating since establishing care with a primary care provider in mid-October 2016 (Exhibits 1F/32-33, 35-38, 47-49, 56-59, 85-86, 93, 2F/4-6, 3F/4-6, 6F/7-12, 44-45, 7F/1, 11, 43, 49-50 and 8F/1-8).

(Tr. 20.)  In addition to considering Ms. Extine's subjective reports, testimony, and treatment records, the ALJ considered other opinion evidence, including the opinion of treating psychologist Dr. Strahan.  (Tr. 23-24.)  The ALJ found that Dr. Strahan's opinion that Ms. Extine had no to mild limitations in social interaction (Tr. 855) was not persuasive (Tr. 24.)  The ALJ explained:

> the objective evidence does not support Dr. Strahan's [ ] opinion that the claimant has no to mild limitations in social interaction with regard to her ability to work. Mentioned above, the claimant consistently reported of social anxiety, particularly in public, for which [she] sought therapy for assistance and generalized anxiety due to her gender dysphoria (Exhibits 1F/20, 25, 32, 43-44, 2F/4-6, 3F/4-6, 5F/96-97, 7F/1-4, 8-9, 11-12, 14-18, 39-43, 50-57 and 9F/1-2). Although the claimant further provided treatment assisted with her anxiety symptoms, the claimant's need for such specialized treatment supports that the claimant has more than mild symptomology as contemplated by Dr. Strahan (Exhibits 1F/20-25, 32, 43-44, 78, 2F/4-6, 3F/4-6, 6F/21, 7F/1-4, 8-9, 11-18, 39-43, 50-57 and 9F/1-2). The undersigned does not find that part of Dr. Strahan's opinion persuasive either as a result.

(Tr. 24.)

Clearly, the ALJ did not ignore evidence documenting Ms. Extine's reported struggles with her anxiety or that her mental health conditions caused limitations on her ability to interact with others.  Indeed, the ALJ accounted for Ms. Extine's limitations in her ability to interact with others.  (Tr. 19, 24-25.)  Further, the ALJ explained the reasons he limited Ms. Extine to occasional rather than occasional and superficial interaction with others, and that explanation is supported by substantial evidence, including normal and cooperative behavior and pleasant interactions during appointments, ability to shop, and ability to visit and interact with friends. (Tr. 24-25.)   The records cited by the ALJ on this point included evidence that Ms. Extine reported going to the shooting range every three weeks, going on walks with her dad every morning, playing games with and interacting online with friends (Tr. 279, 362), going to the Avengers movie in the theater with her roommate on the day it was released (Tr. 763), planning to visit a friend out of state (Tr. 279), talking to friends (Tr. 759), going to stores, speaking to strangers when possible, and interacting with clerks at stores (Tr. 289, 301, 312-13.)

Ms. Extine's argument that a more restrictive social interaction limitation should have been included in the RFC amounts to a request that this Court consider the evidence *de novo*. However, that is not this Court's role.  "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  This is because it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  This Court cannot overturn the decision in this case "so long as substantial evidence also supports the conclusion reached by the ALJ," even if a preponderance of evidence supports Ms. Extine's position.  *Jones*, 336 F.3d at 477; *see also Blakley*, 581 F.3d at 406.

Reviewing the record as a whole along with the ALJ's stated reasons for limiting Ms. Extine to occasional interactions with others, the undersigned finds the ALJ's decision sufficiently articulated in order to allow for meaningful review.  The undersigned further finds that the ALJ built a logical bridge between the evidence and his conclusion, and the decision has the support of substantial evidence.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

November 8, 2022

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).